IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GINO L. ESPARZA,<br><br>      Plaintiff,<br><br>v.<br><br>SHERI VERSTRAETE, DOUG TALBOT, COREY MARTIN, PAUL KILQUEST, MELISSA COOPER, JOSE CERNA, and CHRISTOPHER HEDGEPETH,<br><br>      Defendants. | Case No. 3:18-CV-00559-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion for Summary Judgment filed by Defendants Sheri Verstraete ("Verstraete"), Doug Talbot ("Talbot"), Corey Martin ("Martin"), Paul Kilquest ("Kilquest"), Melissa Cooper ("Cooper"), and Jose Cerna ("Cerna") (Doc. 44); and a Motion for Summary Judgment filed by Defendant Christopher Hedgepeth ("Hedgepeth") (Doc. 51). For the reasons set forth below, the Court grants the Motions for Summary Judgment.

FACTUAL & PROCEDURAL BACKGROUND

This action arises out of a search of Plaintiff Gino L. Esparza's ("Esparza") former apartment in Collinsville, Illinois, conducted by employees of the Illinois Department of Corrections ("IDOC"), the Collinsville Police Department ("Collinsville PD"), and the

Collinsville Code Enforcement and Building Inspector Office ("Code Office") on January 24, 2018 (Doc. 26).

At the time of the events in question, Esparza's mother, Rosemary Miller ("Miller"), was a parolee and was subject to conditions of parole enforced by IDOC (Doc. 52-1 at 4). Defendant Hedgepeth, then employed as an IDOC parole agent, was assigned to supervise Miller (*Id.*). On January 9, 2018, Miller called an automated IDOC system and reported a change of address to 405 East Main Street, Apartment 5, Collinsville, Illinois, ("Apartment 5") (*Id.*). Hedgepeth subsequently visited that address on the same day (*Id.*)

In the course of that visit, Hedgepeth had the mother of Esparza's children, Madeline Ross ("Ross"), complete a Host Site Agreement in which Ross acknowledged that Miller resided at the address and that because of this the residence was "subject to search at any time by parole agents or designated [IDOC] staff" and that Ross consented to the possibility of arbitrary searches (*Id.*; Doc. 45-1). Hedgepeth has stated that Ross indicated that she was a lessee of the apartment (Doc. 52-1 at 9). Esparza was also in the apartment at the time that the Host Site Agreement was completed (Doc. 55-1 at 3) but states that he left the room and was not present when the Host Site Agreement was completed (Doc. 45-3 at 14). Esparza has further stated that Ross was not on the lease and did not reside at the apartment but merely stayed there on occasion when their mutual children were visiting (Doc. 45-3 at 4). Esparza has indicated that he was the only person residing at the apartment at that time and that he was not aware that Miller considered

herself to be residing at that address or that she had stated as much to IDOC (*Id.* at 45-2 at 5, 7; 45-3 at 3).

On January 18, 2018, Hedgepeth received a call from Defendant Fields, then employed as an officer with the Collinsville PD. (Doc. 55-1 at 3). Fields requested that Hedgepeth meet with him to conduct a compliance check on Miller and Miller's daughter, Kristen Miller, who was also a parolee and who was presently residing in Apartment 1 of the same building as Apartment 5 (*Id.*). Fields's stated reason for requesting this compliance check was that the apartment complex was under surveillance and located in a high traffic drug area (*Id.*). Hedgepeth spoke to his supervisor, who instructed him to tell Fields to submit a formal request on official letterhead, and Hedgepeth relayed this information to Fields (*Id.* at 4). Later that same day, Fields submitted a formal request, which repeated that numerous drug dealers and users frequented the apartment complex (*Id.*; Doc. 45-6).

Based on this request, Hedgepeth and other IDOC employees went to the apartment complex on January 24, 2018, at 8:00 a.m. (Doc. 55-1 at 4). Esparza stated that he answered the door after hearing loud knocking and discovered that an officer had knocked a hole in his door with a flashlight (Doc. 45-2 at 7). Esparza found several officers outside his door and was asked if Miller was present in the apartment (*Id.*). He stated that he said he would check and went to look for her in the apartment, leaving the officers outside (*Id.* at 8). Esparza said that he found Miller in his children's bedroom and returned to the door to tell the officers this, but found the officers were already entering the apartment (Doc. 45-2 at 9–10). Esparza stated that an officer grabbed him by the arm

and put him up against a table and handcuffed him before sitting him down (*Id.*) Esparza has indicated that he told the officers that they did not have permission to enter his home without a warrant (*Id.*). Hedgepeth stated that in a situation where an individual objected to the entry of IDOC officers into premises where a parolee was known to be present, IDOC officers were trained to contact their commanders, who would then determine whether or not to call and request a warrant (Doc. 52-1 at 8). Hedgepeth was present at Esparza's apartment for some of the period in which the parole officers entered, but he also spent time in Apartment 1, which was also being entered by parole officers. Hedgepeth did not recall seeing officers knock a hole in Esparza's door with a flashlight and did not recall hearing Esparza state that officers could not enter without a warrant or seeing officers restrain Esparza (Doc. 52-1 at 7–8).

Once officers entered the apartment, they searched the room in which Miller was staying, finding substances suspected to be methamphetamine and drug-related paraphernalia (Doc. 55-1 at 4). A breathalyzer test was also administered to Miller, who tested positive for methamphetamine (*Id.*). IDOC officers then called the Collinsville PD, who came to the scene to take possession of Miller and the suspected narcotics (*Id.*). Kilquist, an officer in the Collinsville PD, indicated in his case report that he responded to the scene to assist the IDOC officers, having been informed that they had located illegal narcotics and paraphernalia (Doc. 45-5 at 4). Kilquist noted that officers Martin, Cooper, Cerna, and Talbot also arrived on the scene to assist. Kilquist directed officers Martin and Cooper to Apartment 5, while he went to Apartment 1 with Cerna and Talbot (*Id.*), with Kilquist later entering Apartment 5 as well (*Id.*). Kilquist also indicated that employees

from the City of Collinsville's Code Enforcement and Building Inspector Office ("Code Office"), including Verstraete, subsequently arrived on the scene to survey "dangerous conditions of the interior and exterior of the apartment complex" (*Id.*).

Esparza indicates that the Collinsville PD officers entered the apartment and immediately began searching the apartment thoroughly, going through drawers and cabinets (Doc. 45-3 at 8). Esparza states that he consistently told Collinsville PD officers not to enter or search his home without a warrant (Doc. 45-2 at 11). Esparza also described a blonde female Collinsville PD officer present in his apartment whom he believed to be Cooper (*Id.*). Esparza did not indicate that he had ever met Cooper before (*Id.*). Additionally, Esparza identified Verstraete, an employee of the Code Office, as being present in his apartment taking pictures (*Id.* at 13). Esparza stated that he had previously met Verstraete a week or two before when she had approached him and asked him to let her take pictures inside the apartment complex (*Id.*). Esparza told the officer—whom he believed to be Cooper—to not take pictures of the apartment, but he has indicated that she responded by "trying to tell me how bad my landlord was" (*Id.*). Hedgepeth has indicated that he was unaware of who the landlord of the building was (*Id.* at 9).

Esparza has stated that no property was destroyed in the course of the search but that he suffered emotional injuries and that his apartment was disarrayed by the search and required cleaning afterwards (*Id.* at 14). Esparza estimated that the period of the search, and the period of his restraint, lasted approximately 35 to 40 minutes (Doc. 45-3 at 8).

*Procedural Facts*

Esparza brought this action in the Third Judicial Circuit of Madison County, Illinois, on February 1, 2018 (Doc. 1-3). On March 9, 2018, Defendants Verstraete, Talbot, Martin, Kilquest, Cooper, and Cerna filed a notice of removal in this Court (Doc. 1). After removal was accepted by this Court, Esparza filed his First Amended Complaint on November 20, 2018, adding Josh Fields of the Collinsville PD and Hedgepeth as defendants and alleging that Defendants violated Esparza's rights under the Fourth and Fourteenth Amendment by entering and searching his apartment and restraining him and that defendants conspired to violate his rights through arranging a search to evade the warrant requirement of the Fourth Amendment (Doc. 26). On July 22, 2019, Defendants Cerna, Cooper, Fields, Kilquest, Martin, Talbot, and Verstraete filed their Motion for Summary Judgment ("Collinsville MSJ"). On August 9, 2019, Defendant Hedgepeth filed his Motion for Summary Judgment. Defendant Josh Fields was dismissed from this action on September 6, 2019, due to Esparza's failure to respond to his Motion to Dismiss, filed on January 18, 2019 (Doc. 54).

Plaintiff Esparza filed his combined response to Defendants' Motions for Summary Judgment on September 10, 2019, after the August 26 deadline for a response to the Collinsville MSJ. Per Local Rule 7.1(c), "failure to file a timely motion may, in the Court's discretion, be considered an admission of the merits of the motion." As Esparza was also responding to Hedgepeth's Motion for Summary Judgment, however, the Court is inclined to permit his late response and proceed to consideration of the Motions for Summary Judgment.

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence[.]" *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)).

## ANALYSIS

I. **Fourth Amendment Search of Esparza's Apartment**

a) *Applicable Law*

The Fourth Amendment ordinarily prohibits the warrantless entry of a person's home as unreasonable *per se*. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006). There are certain exceptions, however, to that general rule which are relevant to this action.

Among the exceptions to the warrant requirement is the principle that warrantless searches are permissible with the voluntary consent of a person possessing authority to grant entry to the premises in question. *Id.* (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). Consent might be granted by the owner of the premises, a fellow occupant, or even a person with mere apparent authority to grant entry. *Id.* (citing *Rodriguez*, 497 U.S. at 186). Where one individual has consented to a search and another occupant to the premises refuses the search, a physically present co-occupant's stated refusal to permit entry renders warrantless entry and search unreasonable and invalid as to the refusing party. *Id.* at 105. In order for refusal of a co-tenant to negate consent, however, the Supreme Court has emphasized that the co-tenant must refuse entry at the threshold, when officers initially seek to enter the premises, while "the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." *Id.* at 114–15. In general, the Supreme Court has stated that consideration of social expectations is a key factor in assessing the reasonableness of a consent search. *Id.* at 111.

In addition to consent, the Supreme Court has recognized exceptions to the warrant requirement where "special needs" of law enforcement make the warrant and

probable-cause requirement impracticable. *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (applying special needs exception to probation system). In particular, searches of premises where parolees reside may be justified by government interests in enforcing parole restrictions. Parolees do not enjoy "the absolute liberty to which every citizen is entitled, but only…conditional liberty properly dependent on observance of special parole restrictions." *United States v. Douglas*, 806 F.3d 979, 985 (7th Cir. 2015) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). Where a parolee or probationer is subject to a search condition, absent an explicit limitation on the types of searches that may be conducted, the Fourth Amendment does not impose such a limitation. *United States v. Knights*, 534 U.S. 112, 116–18 (2001). Rather, the permissible scope of such a search must be assessed based on the "totality of the circumstances" and requires an assessment on the degree to which it intrudes on a parolee's diminished privacy expectations and the degree to which it promotes legitimate government interests. *Id.* at 118–19 (citing *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). A search condition, thus, constitutes a signification limitation on an individual's reasonable expectation of privacy. *Id.* In the past, certain courts have held that others who knowingly share a residence with such an individual likewise have their privacy expectations diminished, though these cases do not appear have not considered a situation where a co-habitant denies consent to search to officers at the door of the residence seeking entry. *See, e.g.*, *State v. Hurt*, 2007 ND 192 at ¶19 (collecting cases supporting proposition that persons living with probationers have diminished privacy expectations); *cf. People v. Anderson*, 2011 Cal. App. Unpub. LEXIS 5865 at *62–63 (Aug. 4, 2011) (concluding that where cotenant denied consent as

officer sought to enter trailer for probation check, search was permissible because officer was not aware individual was cotenant and he was physically outside trailer when search occurred).

Where law enforcement officers have already entered a space through some valid exception to the warrant requirement, further seizure of evidence and contraband may be justified based on the "plain view" exception, where (1) the officer is lawfully present in the place where the evidence is located, (2) the officer has a lawful right of access to the evidence itself, and (3) the incriminating character of the evidence is immediately apparent. *Horton v. California*, 496 U.S. 128, 136–37 (1990).

Even where a search could be justified by an exception to the warrant requirement, it may rise to the level of a violation if it exceeds its permissible scope or is based upon a pretext, purposefully using a warrant exception as a back door around the warrant requirement. *See, e.g.*, *Abel v. United States*, 362 U.S. 217, 225–26 (1960) (noting that courts should resist pretextual use of administrative warrants to gain evidence in criminal cases, circumventing criminal warrant process); *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) (searches for administrative purposes without individualized suspicion must be appropriately limited); *Club Retro LLC v. Hilton*, 568 F.3d 181, 197–98 (5th Cir. 2009) (alcohol control ordinance permitting administrative search of bar did not justify mass raid to search for narcotics). The Supreme Court, however, has indicated that apart from certain special needs and administrative cases, it is generally unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers. *Knights*, 534 U.S. at 122 (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)).

Even where a Fourth Amendment violation is determined to have occurred, a plaintiff must show that a defendant was personally responsible for the alleged deprivation. *See, e.g.*, *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). Personal involvement will be found where a defendant directed the constitutional violation or if it occurred with the defendant's knowledge or consent. *Id.*

b) *Discussion*

The search of Apartment 5 was originally commenced by IDOC officers, who intended to conduct the search as a parole check based on consent to search previously granted by Miller and by Ross. The circumstances surrounding that consent—Miller's presence in Apartment 5 along with Ross while Esparza was there, their signatures on the consent form—are sufficient to indicate that they held themselves out as residents of Apartment 5 and that Hedgepeth and the other IDOC officers were justified in believing that consent had been granted.

Even with consent from Ross and Miller, the Court must determine what to make of Esparza's denial of consent at the door. The situation at first glance appears to present facts similar to those in *Randolph*, and if this case were not distinguishable from *Randolph*, this Court would have to conclude that the initial entry and search was unjustified. Whereas in *Randolph*, the Supreme Court considered merely the government's "generalized interest in expedient law enforcement[,]" *Randolph*, 547 U.S. at 115 n. 5, here the defendants' position is stronger due to the government interest in enforcing parole conditions. Thus, the search at issue here presents elements of both a *Randolph*-style consent search and a special needs search as in *Knights* and *Griffin*. Here, the search is

justified not merely based on consent, but also based on IDOC's need to monitor parolees and enforce conditions of release. The Court is unaware of any other decisions, precedential or persuasive, that have examined *Randolph* in the context of a parole or probation search where a co-habitant objected to entry at the threshold.

Ultimately, the Court is inclined to conclude that the government interest in parole enforcement, coupled with the consent given in the Host Site Agreement, is sufficient to outweigh society's diminished expectations of privacy for an individual residing with a parolee, even where such an individual attempts to deny consent upon entry. To allow a co-habitant like Esparza to prevent a search of a parolee's domicile where other co-habitants and the parolee had already consented to search would make it difficult to gain reliable access to shared premises inhabited by parolees. Ultimately, this might frustrate the purpose of the parole system itself, making it easy for parolees to evade monitoring and preventing enforcement of the conditions of release. The fact that Esparza states that he was unaware that Miller claimed to be residing in Apartment 5 is not relevant here—again, the circumstances surrounding the signing of the Host Site Agreement indicate that Hedgepeth and the IDOC officers reasonably believed that Rosemary was living in Apartment 5 and that co-habitants were aware of her presence. Thus, the initial search conducted by Hedgepeth and the IDOC officers did not violate Esparza's reasonable expectations under the Fourth Amendment.

Even if the Court's conclusion about the permissibility of search over Esparza's consent were found to be erroneous, Esparza still fails to show personal involvement of most of the defendants in the violation in question. While Hedgepeth might have been

aware that Esparza was refusing consent, the relevant point for denial of consent under *Randolph* is when officers first enter the apartment—at that moment, none of the defendants other than Hedgepeth were present, and there is no indication that they would have later been aware that Esparza had attempted to deny consent at the key moment. The Court further notes that there is no indication that Officers Cerna and Talbot ever entered Apartment 5, as Kilquist's report indicates that they searched Apartment 1 and Esparza cannot identify them.

The search conducted by the Collinsville PD appears to have exceeded the scope of the initial search conducted by Hedgepeth and the IDOC officers and must to some extent be analyzed separately. While the IDOC officers appear to have confined their search to the room inhabited by Miller, Esparza indicates that the Collinsville PD expanded the search to the rest of the apartment, searching through drawers and cabinets. As this search went beyond the immediate surroundings of the arrested individual, the premises were already secured by IDOC, and there is no indication of exigent circumstances, it goes beyond the scope of what would be permissible as a protective sweep or search incident to arrest. Thus, this further search could only be justified by the same consent and special needs concerns that rendered the IDOC search permissible. While the search conducted by the Collinsville PD went beyond the areas occupied by Miller, the consent granted in the Host Site Agreement allowed for arbitrary searches of the entire apartment, not only the areas occupied by the parolee. Furthermore, it seems reasonable to conclude that a parolee might easily hide contraband in areas of a shared residence outside of those specifically occupied by the parolee, indicating that the

special need of law enforcement extend to a search of the whole of the premises. Accordingly, the Court concludes that this more expansive search was permissible.

Even if the search by Collinsville PD was justified by special needs, however, the presence of Verstraete from the Code Office and her search for building code violations appears unrelated to enforcing Miller's conditions of parole and likely not justified by special needs. That being said, Kilquist's notes indicate that code violations were clearly visible inside the apartment. Esparza also states that Collinsville PD officers began photographing his apartment after entry and noting that he had a deficient landlord, indicating that Collinsville PD officers observed the code violations even before Verstraete from the Code Office arrived. The court thus concludes that this extension of the search was permissible under the plain view doctrine.

Furthermore, there is no indication that Hedgepeth had knowledge that the Collinsville PD were additionally conducting a search for code violations. Absent personal involvement, Cerna, Talbot, and Hedgepeth cannot be liable, even if Verstraete's search for code violations were to be deemed impermissible.

The Court grants summary judgment to all defendants on this issue.

## II. Fourth Amendment Seizure of Esparza

a) *Applicable Law*

A "seizure" under the Fourth Amendment amounts to a restraint placed upon an individual's freedom by a police officer; it need not rise to the level of a custodial arrest. *Terry v. Ohio*, 392 U.S. 1, 16 (1968). Seizures exist on a spectrum—while more restrictive forms of seizure require a warrant or probable cause, other less intrusive seizures need

not meet these thresholds to be deemed permissible, but must be based on reasonable suspicion. *See id.* at 27. The Supreme Court has previously ruled that handcuffing an occupant during a search of premises based on a valid warrant is not a violation of the Fourth Amendment, even if the seizure itself is not based on probable cause or even reasonable suspicion. *Muehler v. Mena*, 544 U.S. 93, 98 (2005); *Michigan v. Summers*, 452 U.S. 692, 700–05 (1981). In these cases, the Supreme Court weighed the law enforcement interest and the nature of the articulable facts supporting detention against the intrusion inflicted upon the individual detained, noting that there was sufficient probable cause to persuade a judicial officer to permit the search and that the intrusion incurred by restraint was minimal where officers were already justified in searching the premises.

In both *Muehler* and *Summers*, the Supreme Court relied on the fact that the searches in question took place pursuant to valid warrants issued by impartial judicial authorities, but in *Summers* the Court refused to exclude the possibility that comparable conduct might be permissible during a warrantless search justified by exigent circumstances. *Summers*, 452 U.S. at 702 n.17. The Court in *Bailey v. United States*, 568 U.S. 186, (2013), expanded on its holding in *Summers*, noting that there were three important law enforcement interests that justified the detention of an occupant on the premises during the execution of a search warrant: officer safety, facilitating completion of the search, and preventing flight. Certain courts have extended the reasoning of *Muehler* and *Summers* to parole searches, concluding that these too permit officers to detain occupants of premises being searched. *Sanchez v. Canales*, 574 F.3d 1169, 1173 (9th Cir. 2009) ("We hold . . . that officers may constitutionally detain the occupants of a home during a parole

or probation compliance search[.]"), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012); *Frego v. Kelsick*, 690 F. App'x 706, 709–10 (2d Cir. 2017) (permitting detention "using reasonable force" pursuant to warrantless parole search); *Ulitchney v. Ruzicki*, 412 F. App'x 447, 452 (3d Cir. Jan. 5, 2011) (permitting temporary seizure during warrantless search of probationer's home).

b) *Discussion*

Here, IDOC officers had general suspicion that drugs were being sold in the apartment complex as a whole and had the additional justification of conducting a parole search. This Court is of the opinion that a parole search of this variety presents the same law enforcement interests as discussed in *Bailey*, and that detention of co-habitants is justified here as well. As in searches pursuant to a warrant, parole searches involve a search for physical contraband, and parolees and their co-habitants may be inclined to hide or destroy these materials if left free to move. An interest in officer safety is present in parole searches as well—parolees are individuals who have committed crimes in the past, and officer safety justifies taking "unquestioned command of the situation" during a parole search. *See Bailey*, 568 U.S. at 195. Lastly, while only the parolees themselves would appear to present a flight risk in the context of parole search, some detention seems justified in this context to permit officers to identify residents and distinguish the parolee from co-habitants. Accordingly, the Court is inclined to follow the view of the Ninth Circuit in *Sanchez* in concluding that officers may detain occupants of a home during a parole search. Esparza's detention, which lasted no longer than the 30-40 minutes of the search, does not appear to have been unreasonably intrusive in this context.

The Court grants summary judgment to all Defendants on this issue.

### III. Esparza's Conspiracy Claim

a) *Applicable Law*

Esparza alleges that defendants conspired to deprive him of his constitutional rights under 42 U.S.C. § 1983 by using a pretextual search to evade the warrant requirement under the Fourth Amendment. To succeed in a § 1983 claim based on a theory of conspiracy, a plaintiff must show that (1) the defendants reached an express or implied agreement to deprive plaintiff of his constitutional rights, and (2) plaintiff was deprived of his constitutional rights by defendants' overt actions in furtherance of the agreement. *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988). While conspiracy may be established by circumstantial evidence, such evidence cannot be speculative, vague, or conclusory, and overt acts must be shown related to the promotion of the alleged conspiracy. *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003); *Amundsen v. Chicago Park District*, 218 F.3d 712, 718 (7th Cir. 2000).

b) *Discussion*

Here, Esparza alleges that defendants "conspired" to enter his apartment. However, merely planning to search Apartment 5 based on information that it was located in a drug hotspot does not constitute a conspiracy to violate Esparza's rights. As established, IDOC and Collinsville PD were justified in thinking that the Host Site Agreement allowed them to search the premises to enforce Miller's release conditions. The first moment at which they conceivably could have had an inkling that they were doing something wrong was when Esparza opposed their entry at the door—at this point,

any proceeding communications and plans could not be considered a conspiracy, as defendants were unaware that Esparza would oppose their entry until he actually did so. Furthermore, the Court has already ruled that entry over Esparza's objections was permissible, so any plan to do so would not constitute a conspiracy to violate Esparza's rights.

The only potentially valid basis for a conspiracy that the Court can see is the presence of Verstraete at Apartment 5—combined with Esparza's statement that Verstraete had previously sought to enter the apartment complex to look for code violations, the fact that Verstraete responded with Collinsville PD and surveyed the apartment for violations could be viewed as circumstantial evidence of a conspiracy to use the previously planned parolee check as a back door to get Verstraete inside the apartment complex without a warrant. However, this evidence is thin, and does not indicate that any of the defendants other than Verstraete were aware that the Code Office had previously been seeking entry to look for code violations. Accordingly, there is no evidence of any agreement between any of the defendants, and there is no case for a conspiracy. The Court grants summary judgment to all defendants on this issue.

### IV. **Qualified Immunity**

a) *Applicable Law*

Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To

determine if qualified immunity is appropriate, a court must assess whether an official's conduct violated a constitutional right and second whether that right was clearly established. *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). For a plaintiff to show that a right was clearly established, he must show that the right alleged to be violated was "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010)). The Supreme Court has clarified repeatedly that "clearly established law should not be defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). To deny qualified immunity, a court must be able to "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Id.*

b) *Discussion*

The burden is on Esparza as the plaintiff in this action to establish that the rights which he alleges to have been violated were clearly established at the time of the violation. As discussed in this order, this Court has found that case law within this circuit and relevant precedents from the Supreme Court are largely silent on key issues on this case, such as whether a search over Esparza's initial objection was permissible, whether the scope of the search exceeded what is permissible. Accordingly, under the facts as alleged in the complaint, Esparza has not established that his rights against the search and seizure described were clearly established, and Defendants would have qualified immunity against those portions of his complaint.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** summary judgment to all Defendants and **DISMISSES** this action **with prejudice**. The Court **DIRECTS** the Clerk of Court to close this case and enter judgment accordingly.

**IT IS SO ORDERED.**

DATED:   February 28, 2020

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**